**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARMEN ROSA GOMEZ, individually and as Administrator Ad Prosequendum of the Estate of Jorge L. Gomez, deceased, | |
| *Plaintiff,* | Civil No.: 17-cv-231 (KSH) (CLW) |
| v. | |
| H&M INTERNATIONAL TRANSPORTATION, INC.; NORFOLK SOUTHERN CORPORATION; CONSOLIDATED RAIL CORPORATION; TECHNICAL SERVICES INTERNATIONAL; MI-JACK PRODUCTS, INC.; HOIST LIFTRUCK MANUFACTURING, INC.; FEDEX FREIGHT, INC.; GENERAL CABLE INDUSTRIES, INC.; PMX INDUSTRIES, INC.; BRADY MARINE REPAIR CO., INC.; and NORFOLK SOUTHERN RAILWAY COMPANY, | **OPINION** |
| *Defendants.* | |

**Katharine S. Hayden, U.S.D.J.**

## I.     Introduction

Plaintiff Carmen Rosa Gomez ("plaintiff") has brought this lawsuit individually and as the administrator of the estate of Jorge L. Gomez ("Gomez"), her late husband, who was fatally injured in 2016 while working at the Croxton Intermodal Terminal in Jersey City, New Jersey. Plaintiff has asserted a claim under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*; a negligence claim under New Jersey common law; claims for design defect and failure to warn under the New Jersey Products Liability Act (NJPLA), N.J.S.A. § 2A:58C-2 *et seq.*; and derivative claims for wrongful death, survival, and loss of consortium. The operative complaint names as defendants 11 companies with varying roles in relation to the incident, including

Gomez's employer, the terminal's owners, the owner of the intermodal shipping container Gomez was moving, the owner of the cargo in the container, and companies that designed, manufactured, or maintained the lift truck he was operating.

Four defendants have now moved for summary judgment, three of them on threshold legal issues relating to whether they are properly the subject of plaintiff's FELA claim. Defendant H&M International Transportation, Inc. ("H&M"), Gomez's employer, contends it is not a common carrier and therefore not subject to FELA liability.  (D.E. 208 (motion), D.E. 234 (reply).)  H&M's motion is opposed by plaintiff (D.E. 218) and by co-defendant Hoist Liftruck Manufacturing, Inc. ("Hoist") (D.E. 214-216), which designed and manufactured the lift truck.

Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (together, "Norfolk Southern"), the owners of the terminal and the lift truck, seek summary judgment on the FELA claim, arguing that they were not Gomez's employer. (D.E. 210 (motion); D.E. 235-237 (replies).)  Plaintiff (D.E. 219) and Hoist (D.E. 220-222) oppose the motion.

Defendant Brady Marine Repair Co. ("Brady") seeks summary judgment on all claims and crossclaims against it, contending that plaintiff has failed to raise a triable issue of fact as to breach and causation and therefore cannot prove Brady was negligent. (D.E. 241 (motion); 248-250 (replies).)  The motion is opposed by plaintiff (D.E. 244), Hoist (D.E. 243), and co-defendants FedEx Freight, Inc. and General Cable Industries, Inc. ("FedEx") (D.E. 246).

## II.  **Background**

Gomez was employed by H&M as a lift truck operator at the Croxton Intermodal

Terminal,[1] which was owned by Norfolk Southern and at which H&M provided services pursuant to an August 1, 2016 operating agreement between it and Norfolk Southern (the "operating agreement"). (D.E. 208-1, H&M R. 56.1 Stmt. ¶¶ 1-2.)[2] On August 15, 2016, he was using a Hoist lift truck to unload shipping containers from railcars. (*Id.* ¶ 21.) Plaintiff alleges that the truck collapsed under the weight of the container, crushing Gomez. (SAC ¶¶ 19, 29, 48, 68.) The cause of the collapse and the specific components involved are sharply disputed and are the subject of ongoing discovery.

On January 12, 2017, plaintiff filed the instant lawsuit. (D.E. 1.) After the Court granted Hoist's motion to dismiss the original complaint as against it (D.E. 39, 40), plaintiff filed an amended complaint (D.E. 47). Following the Court's ruling on motion practice directed to the

---

[1] "An intermodal yard is a rail terminal where cargo is transferred from rail cars to trucks, usually in the same large containers." *Williamson v. CONRAIL*, 926 F.2d 1344, 1347 (3d Cir. 1991).

[2] Unless otherwise noted, facts recited herein are undisputed, insofar as the Court can so discern from the record before it. The Court is, however, compelled to observe that its task in resolving these motions has been impeded by the procedural deficiencies in the parties' papers. Among them: In response to Norfolk Southern's Local Civil Rule 56.1 statement, plaintiff provided no substantive response, stating instead that she "objects to NS's statement of material facts as procedurally improper pursuant to Fed. R. Civ. P. 56." (D.E. 219, at 1.) And although plaintiff responded to the Rule 56.1 statements that accompanied H&M's and Brady Marine's summary judgment motions, she improperly did so solely within her opposition briefs. (*Cf.* L. Civ. R. 56.1(a) ("Each statement of material facts shall be a separate document (not part of a brief) . . . ."). Furthermore, when a party disputes a statement of material fact, it is required to "stat[e] each material fact in dispute and cit[e] to the affidavits and other documents submitted in connection with the motion." *Id.; see also* Fed. R. Civ. P. 56(c)(1)(A) (party to cite "particular parts" of record in supporting assertion). These requirements were, at best, inconsistently followed here. (*See, e.g.*, D.E. 244 at 3 ¶ 17 (in response to Brady Marine's statement that a witness was deposed on January 6, 2020, and that he was the company's general manager, plaintiff stated, without citation or explanation, "Deny"); D.E. 216 (Hoist repeatedly citing a 20-page contract and 212-page deposition transcript in their entirety in support of factual statements it disputes).) All counsel shall review Fed. R. Civ. P. 56, L. Civ. R. 56.1, and Judge Hayden's judicial preferences (see New Jersey Federal Practice Rules, Survey of Judicial Officers, Publishers App'x 2 (Gann 2020)). Any future motion papers that do not strictly comply with the rules may be stricken.

amended complaint (D.E. 71, 72), plaintiff filed the operative second amended complaint (D.E. 107, SAC). In it, plaintiff has asserted claims pursuant to FELA, 45 U.S.C. § 51 *et seq.*, against H&M, Norfolk Southern, and Consolidated Rail Corporation ("Conrail") (count 1); design defect and failure to warn under the NJPLA, N.J.S.A. § 2A:58C-2 *et seq.*, against Hoist (counts 2 and 3); negligence against all defendants (count 4); and wrongful death, survival, and loss of consortium against all defendants (counts 5-7). Defendants individually answered the complaint and filed crossclaims against each other. Plaintiff later dismissed count 4 against Hoist (D.E. 132), and dismissed her claims against defendant PMX Industries, Inc. entirely (D.E. 260). More recently, plaintiff dismissed count 1 against Conrail. (D.E. 292.)

As indicated earlier, the summary judgment motions filed by H&M and Norfolk Southern relate solely to whether those defendants are properly the subject of the FELA claim in count 1. Brady Marine's motion, however, seeks summary judgment in its favor on all counts against it.

### III.   Standard of Review

Summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] failure of proof on one of the essential elements of a claim renders both of these requirements met." *Pyfer v. Am. Mgmt. Servs. (In re Nat'l Pool Constr., Inc.)*, 598 F. App'x 841, 844 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

In reviewing the motion, the Court "view[s] the facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (quoting *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)). A factual dispute is "material" if it bears upon an essential element of the plaintiff's claim, and is "genuine" if the evidence would allow a reasonable jury

to find in favor of the non-movant. *Id.* (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003)). "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Id.* (citing *Lauren W. v. Deflaminis*, 480 F.3d 259, 266 (3d Cir. 2007)). Mere allegations do not suffice, *id.*, and neither do "'bare assertions, conclusory allegations, or suspicions,'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (quoting *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)). At this stage, the Court may not make credibility determinations or weigh the evidence. *Burton v. Teleflex, Inc.*, 707 F.3d 417, 428-29 (3d Cir. 2013).

## IV. <u>Discussion</u>

### A. **H & M International's Motion for Summary Judgment**

H&M, Gomez's employer, seeks summary judgment in its favor on plaintiff's FELA claim in count 1, contending that it is not a common carrier by railroad, an essential element of the claim.[3]  Plaintiff and Hoist each oppose H&M's motion and, in separate briefs, argue that at a minimum there are triable issues of fact about whether the services H&M performs at the Croxton terminal, together with its contract with Norfolk Southern, qualify it as a common carrier by railroad.  Although the parties generally agree on the tasks H&M performs at the

---

[3] H&M also argues that plaintiff's remaining claims against it, as well as its co-defendants' crossclaims, should be dismissed under the New Jersey Workers' Compensation Act, N.J.S.A. §§ 34:15-1 to -128.  These arguments are premature.  With the exception of Brady Marine's motion, which was the subject of separate permission granted, the non-FELA claims are outside the scope of the motion practice properly before the Court (D.E. 202, 212), and the issues H&M raises as to them have not been fully briefed by the opposing parties.  Accordingly, the Court does not reach H&M's arguments on counts 4 through 7 or the crossclaims against it.

terminal, they disagree on the test the Court should use to determine whether H&M is a "common carrier by railroad" under FELA as a matter of law.

FELA was enacted in 1908 against the backdrop of "exceptionally hazardous" working conditions for railroad employees that resulted in the "'death or maiming of thousands of workers every year.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting *CONRAIL v. Gottshall*, 512 U.S. 532, 542 (1994)). The statute aims to "'shif[t] part of the human overhead of doing business from employees to their employers,'" *id.* (quoting *Gottshall*, 512 U.S. at 542), and to "provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer or their fellow employees," *Atchison, T. & S. F. R. Co. v. Buell*, 480 U.S. 557, 561 (1987). These purposes find expression through the statute's "eliminat[ion] of a number of traditional defenses to tort liability," *id.*, and its relaxed standard of causation, *see McBride*, 564 U.S. at 688. *See also Monheim v. Union R.R. Co.*, 996 F. Supp. 2d 354, 361 (W.D. Pa. 2014) (FELA is neither a strict liability law nor a workers' compensation statute, but a "negligence statute with an explicitly-stated relaxed standard of causation" (citing *Gottshall*, 512 U.S. at 542-43)). It has been described as a "broad remedial statute" that is to be liberally construed to accomplish Congress's objectives in passing it. *Buell*, 480 U.S. at 561 (citing *Urie v. Thompson*, 337 U.S. 163, 180 (1949)).

The statutory language relevant to resolution of H&M's motion (and that of Norfolk Southern, discussed *infra*), is as follows:

> Every common carrier by railroad while engaging in [interstate] commerce . . .
> shall be liable in damages to any person suffering injury while he is employed by
> such carrier in such commerce, or, in case of the death of such employee, to his or
> her personal representative . . . for such injury or death resulting in whole or in
> part from the negligence of any of the officers, agents, or employees of such
> carrier, or by reason of any defect or insufficiency, due to its negligence, in its
> cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or
> other equipment. . . .

45 U.S.C. § 51.  The Third Circuit applies a four-part test to determine liability: a plaintiff must

show that (1) the defendant is a common carrier by railroad engaged in interstate commerce, (2)

the plaintiff was employed by the defendant and was assigned to perform duties that furthered

that interstate commerce, (3) the plaintiff's injuries were sustained while employed by the

common carrier, and (4) the plaintiff's injuries resulted from the defendant's negligence.  *Felton*

*v. Southeastern Pennsylvania Transp. Auth.*, 952 F.2d 59, 62 (3d Cir. 1991).

H&M argues that it is not a "common carrier by railroad," seeking to defeat plaintiff's

claim at the first step.  (*See* D.E. 208-2, H&M Moving Br. 6-9.)[4]  Consistent with Supreme Court

jurisprudence in this area, the Third Circuit defines that term as follows:

> A common carrier has been defined generally as ***one who holds himself out to the
> public as engaged in the business of transportation of persons or property from
> place to place for compensation, offering his services to the public generally***.
> The distinctive characteristic of a common carrier is that he undertakes to carry
> for all people indifferently, and hence is regarded in some respects as a public
> servant. The dominant and controlling factor in determining the status of one as a
> common carrier is his ***public profession as to the service offered or performed.***

*Kelly v. Gen. Elec. Co.*, 110 F. Supp. 4, 6 (E.D. Pa. 1953), *aff'd*, 204 F.2d 692 (3d Cir. 1953)

(emphasis added).  This characterization requires courts to closely examine the facts of an

entity's operations to determine, ultimately, whether it is holding itself out in the manner

elucidated in *Kelly*.  *See, e.g.*, *Watts v. H&M Int'l Transp., Inc.*, 2014 U.S. Dist. LEXIS 84731,

*8 (D.N.J. June 20, 2014) (Cecchi, J.) ("Although the question of whether FELA applies . . . is a

question of law, it can only be determined by examining the facts surrounding [d]efendant's

business activities.") (internal citation omitted).

---

[4] In passing, H&M also argues, for the first time in its reply, that plaintiff cannot prove the
negligence element of her FELA claim.  (D.E. 234, H&M Reply 5.)  As this argument is, among
other things, premature given ongoing discovery, the Court will not reach it.

Reflecting the Court's task here is *Kelly* itself, which involved whether the plaintiff, an employee who was injured by a GE-owned-and-operated switching engine on tracks within the GE plant, could sue the company under FELA.  110 F. Supp. at 5.  GE argued it was not a common carrier by railroad engaged in interstate commerce, and therefore was not subject to FELA.  The court looked to GE's activities at the plant.   GE manufactured, repaired, and rebuilt electrical equipment there, and had internal rail tracks connected with a siding of the Pennsylvania Railroad (a common carrier), as well as railcars and engines used to move its products.  The railroad delivered cars to the siding, and GE's engines removed and delivered them throughout the plant.  When the cars contained mixed freight, GE would remove its portion while the cars were within the plant, then return them to the siding for the Pennsylvania Railroad to deliver the remaining freight. By contract with the railroad, the company's internal tracks had to conform with federal and state regulatory requirements.  *See id.* at 5-6.

The court concluded that GE was not a common carrier.  There had been "no showing that [GE] holds itself out generally to the public as offering services of transportation for hire, nor . . . a showing that defendant engages in 'carrying for hire the goods of those who see fit to employ them.'"  *Id.* (quoting *United States v. Louisiana & Pac. Railway Co.*, 234 U.S. 1, 26 (1914)). Instead, GE's rail activities were conducted in-plant for its own business purposes. *See id.*

*Duffy v. Armco Steel Corp.*, 225 F. Supp. 737, 737-38 (W.D. Pa. 1964), engaged in the same analysis, with the same result.  The decedent worked on the train crew of defendant Armco and was fatally injured in an accident, prompting a FELA claim.  The court granted summary judgment for Armco on grounds it was not a common carrier by railroad. Armco manufactured steel, and owned and operated railroad equipment within its plant to transport material and

equipment.  Inbound railcars were delivered by the Bessemer & Lake Erie Railroad, a common

carrier by railroad, to a track in Armco's plant, then moved within the plant using Armco's

locomotives,  and after that the railroad retrieved the railcars from the in-plant tracks.  Armco did

not own the railcars, nor the locomotives that brought the cars in and out of the plant.  Given that

"[t]he railroad equipment owned and operated by Armco has not been used to transport goods of

others, nor has Armco offered their use to the public," it was not a "common carrier by railroad."

*Id.* at 738.

Courts have also examined the relationship of the entity and its operations to any existing

common carrier's operations, including the role, if any, that the entity plays in providing services

that the common carrier offers to the public.  Two Third Circuit cases are illustrative.  *Hi Tech*

*Trans, LLC v. New Jersey*, 382 F.3d 295 (3d Cir. 2004), and *New York Susquehanna & W. Ry.*

*Corp. v. Jackson*, 500 F.3d 238 (3d Cir. 2007), both considered whether the plaintiff companies,

which operated waste transloading businesses and were seeking declaratory judgment that

federal law preempted the application of state environmental regulation of those businesses, were

common carriers, albeit in the context of a statute other than FELA.[5]

---

[5] Under the Interstate Commerce Commission Termination Act ("ICCTA"), a 1995 law that
abolished the Interstate Commerce Commission and created the Surface Transportation Board
("STB"), the STB has "exclusive jurisdiction over 'transportation by rail carrier'" that preempts
state regulation of rail transportation.  *Hi Tech Trans*, 382 F.3d at 305 (quoting 49 U.S.C. §
10501(b)).  As defined by the ICCTA, a "rail carrier" is a "person providing ***common carrier***
railroad transportation for compensation[.]"  49 U.S.C. § 10102(5) (emphasis added).  *Accord*
*Susquehanna*, 500 F.3d at 250 ("[O]nly common carriers fit the [ICCTA's] definition of 'rail
carrier.'" (citing 49 U.S.C. § 10102(5)).  Given this definition, the Court disagrees with plaintiff
that whether H&M is a "rail carrier" under the ICCTA "has no bearing on" whether it is a
"common carrier by railroad" for purposes of FELA.  (*See* D.E. 218, Pl.'s Opp. Br. to H&M
Mot. Summ. J., at 1.)

In *Hi Tech*, under license from Canadian Pacific Railroad ("CPR"), Hi Tech built and operated a waste transloading facility at CPR's railyard. 382 F.3d at 298.[6] Trucks carrying waste arrived at the facility and discharged it into a Hi Tech hopper. Hi Tech would then load the waste onto railcars, which CPR transported to out-of-state disposal facilities. *Id.* at 299. The preemption question turned, in relevant part, on whether Hi Tech was a "rail carrier" and, therefore, whether it provided "common carrier" railroad transportation. The Third Circuit held that even "the most cursory analysis of Hi Tech's operations" showed that they involved transportation *to* rail carrier, not transportation *by* rail carrier – in other words, CPR, not Hi Tech was the rail carrier. *Hi Tech*, 382 F.3d at 308. Per the license agreement, CPR let Hi Tech use part of its railyard to build and operate a transloading facility, but disclaimed any liability for those operations. *Id.* Essentially, Hi Tech ran a transloading operation within CPR's railyard, and the waste collected in that operation happened to end up on railcars of a common carrier providing railroad transportation—a scenario that did not make Hi Tech *itself* a common carrier providing railroad transportation:

> [T]he License Agreement essentially eliminates CPR's involvement in, and responsibility for, the operation of Hi Tech's facility. Hi Tech does not claim that there is any agency or employment relationship between it and CPR or that CPR sets or charges a fee to those who bring C&D debris to Hi Tech's transloading facility.
>
> Accordingly, it is clear that Hi Tech simply uses CPR's property to load C&D debris into/onto CPR's railcars. The mere fact that the CPR ultimately uses rail cars to transport the C&D debris Hi Tech loads does not morph Hi Tech's activities into "transportation by rail carrier." Indeed, if Hi Tech's reasoning is accepted, any nonrail carrier's operations would come under the exclusive jurisdiction of the STB if, at some point in a chain of distribution, it handles products that are eventually shipped by rail by a railcarrier. The district court

---

[6] "Transloading" is "'[t]ransferring bulk shipments from the vehicle/container of one mode to that of another at a terminal interchange point.'" *Susquehanna*, 500 F.3d at 242 n.1. In *Hi Tech* and *Susquehanna*, that meant the transfer of waste from trucks to railcars. *See id.*

could not accept the argument that Congress intended the exclusive jurisdiction of the STB to sweep that broadly, and neither can we.

*Id.* at 308-09 (footnote omitted).[7]

In *Susquehanna*, the Third Circuit, agreeing with the district court, came to the opposite conclusion after a close examination of the company's operations. Susquehanna was a railroad that operated 400 miles of railroad track in three states. 500 F.3d at 242. It built and operated, through a loading company it hired, several transloading facilities on land that it leased or owned. *Id.* Companies known as "shippers" would pick up waste and bring it to the transloading facilities, where Susquehanna's loading operator would transfer it to railcars. Susquehanna then took the waste to out-of-state landfills by rail. The shippers paid Susquehanna for the transloading and transportation of the waste. *See id.*

Distinguishing *Hi Tech*, the panel observed that Susquehanna (already a rail carrier, presumably by virtue of its tracks and operations on them) owned or leased the property, built the facilities, was paid by the shippers to use them, and did not disclaim liability for the loading operations. *Id.* at 249. In substance, Susquehanna's existing status as a rail carrier for other purposes, combined with its control over the transloading operations, meant it was a rail carrier in the context of its waste-hauling operations as well. *See id.* at 249-50.

The panel also addressed whether Susquehanna's guaranteed-capacity contracts with shippers removed it from the definition of "common carrier." The state argued that because Susquehanna generally sold the entire capacity of a facility to one shipper, it offered nothing to the public. *See id.* at 250. Distinguishing between private carriers, which "offer[] services to limited customers under limited circumstances and assume[] no obligation to serve the public at

_____

[7] The panel also observed that Hi Tech had never been certified as a rail carrier by the STB, though it did not ultimately rely on this fact in its ruling. *See id.* at 305.

large," and "common carriers," which "'undertake[] to carry for all people indifferently,'" the panel concluded that Susquehanna fell in the latter group. *Id.* at 250-51 (citing *Kelly*, 110 F. Supp. at 6); *see also id.* at 250 ("general definition" of common carrier is a "'carrier that is required by law to transport passengers or freight, without refusal, if the approved fare or charge is paid'" (quoting Black's Law Dictionary (7th ed. 1999)). Susquehanna's publication of its waste-hauling charges was an indication that it held itself out to the public as available to haul waste "for a reasonable and publicly available rate"; moreover, it did haul waste for multiple customers and there was no evidence that it had turned away a customer. *Id.* at 251.

Per *Hi Tech*, a company that operates a non-rail business that a railroad is neither involved in nor responsible for is not under the "common carrier" umbrella simply because the business is conducted on railroad property and the waste it collects is ultimately shipped by railroad. Per *Susquehanna*, a railroad's "common carrier" status extends to activities that are integrated with its rail transportation business and over which it exercises control, at least where it holds itself out to the public as available to provide such services.

The Supreme Court has engaged in similar line-drawing. For example, in *Edwards v. Pacific Fruit Express Co.*, 390 U.S. 538 (1968), a company that rented refrigerated railcars to railroads was held not to be a common carrier by railroad, even though it owned and maintained railcars and facilities and equipment to repair them and could determine where the railcars would be sent. Albeit the company performed "some railroad functions" in "conducting its business of providing and servicing insulated railroad cars for the carriage of perishable commodities," that did not make it "'one who operates a railroad as a means of carrying for the public.'" *Id.* at 539-40 (quoting *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187-88 (1920)). Merely because activities or facilities are "used in conjunction with railroads and [are] closely related to

railroading" does not elevate them to "railroading itself." *Id.* at 540.  The Court also observed

that express and refrigerator car companies such as the respondent had long intentionally been

excluded from the coverage of FELA.  *Id.* at 541-42.

In contrast, the Supreme Court concluded that services an entity provided to railroads *did*

qualify it as a common carrier in *United States v. Brooklyn Eastern Dist. Terminal*, 249 U.S. 296

(1919), under an analogous statute (the Hours of Service Act) that applied to common carriers by

railroad engaged in interstate commerce.  The Brooklyn Eastern District Terminal operated a

freight station pursuant to contracts with railroads, whereby it received from the railroads

inbound freight, transported it to its docks, and, using its locomotives, hauled it to points within

its terminal for unloading.  It also received outbound freight from shippers and, using its

locomotives, switched and loaded the freight and transported it to the railroads' docks.  *Id.* at

301.  Although it filed no tariffs, did not hold itself out as a common carrier, owned no railcars,

and did not undertake to transport property for anyone other than the railroads with which it had

contracts, the Court nonetheless held that the statute applied to it.  *Id.* at 302-04.  The terminal's

facilities were an "integral part of each railroad line," and its services were "public in nature; and

of a kind ordinarily performed by a common carrier."  *Id.* at 304.  If the same services were done

by the railroad, the Court reasoned, they would be within the statute; they remained within the

statute, and the terminal was not exempt from common carrier status, simply because the

terminal performed the services as an agent of the railroads.  *Id.* at 305-07.

Although none of the foregoing cases involved a scenario precisely equivalent to the one

before the Court – which is unsurprising, given the heavily fact-dependent nature of the inquiry –

all of them provide useful guideposts by which to measure whether H&M has held itself "out to

the public as engaged in the business of transportation of persons or property from place to place for compensation, offering [its] services to the public generally." *Kelly*, 110 F. Supp. at 6. It is undisputed that H&M provided intermodal services to Norfolk Southern that involved the loading and unloading of railcars and transporting them within the terminal. (D.E. 208-1, H&M R. 56.1 Stmt. ¶ 2.)  It unloaded freight containers from railcars and placed them on truck chassis for, ultimately, ground delivery, and it took containers from trucks and loaded them onto railcars. (*Id.* ¶ 8.)[8]  When unloading railcars from inbound trains, H&M's work began only after Norfolk Southern crew members brought the railcars off the mainline track and disconnected them from the locomotives.  (*Id.* ¶¶ 6-7.)  Its responsibilities, all of which were carried out within the bounds of the terminal, also included placing safety flags to protect its workers, supplying tools and vehicles (other than lift trucks) for its employees to use in unloading and moving the containers around the yard, overseeing the rail traffic inbound and outbound and ensuring trains were prepared and moved in a timely manner, and making sure the railways were clear of debris. (D.E. 215, Hoist Supp. R. 56.1 Stmt. ¶¶ 6-10, 12-14.)

Insofar as H&M's services were provided within the terminal, they bear similarities to *Kelly* and *Armco*, which both concluded that the defendants were providing in-plant, not common carrier, services.  But those decisions did not consider the location of the rail service in a vacuum, but instead in the context of assessing whether GE and Armco were offering transportation services to the public.  Equally relevant was what else those defendants' operations entailed—for GE, its electrical manufacture and repair business; for Armco, steel

---

[8] Hoist purports to deny this statement and the one in ¶ 7, but simply states that "H&M performed multiple rail services at Croxton Terminal," citing a 212-page deposition transcript. (D.E. 216, Hoist Resp. to H&M R. 56.1 Stmt. at ¶ 8.)  That is insufficient under Fed. R. Civ. P. 56(c)(1)(A), and the Court deems the statements admitted.

manufacturing.  Here, H&M had no separate, primary business that its rail services happened to be supporting.  Its business was to facilitate the rail services Norfolk Southern provides to its customers.  Indeed, Norfolk Southern has testified that H&M's services were necessary to accomplish the intermodal transportation services that it, a common carrier by railroad, sells to its customers.  (*See* D.E. 218, Pl.'s Opp. Br. 4 ¶¶ 3-5; *see also* D.E. 218-1, Liakas Cert. in Opp. to H&M Mot. Summ. J., Ex. 2, Waters Dep. 25:13-17 (if services H&M provided at Croxton terminal were eliminated, Norfolk Southern could not fulfill its obligations to its customers); *id.* at 95:11-96:1 (absent lift services, terminal could not provide intermodal service).)  In this respect, the arrangement between Norfolk Southern and H&M is also distinguishable from *Hi Tech*, where the company's primary business was transferring waste from truck to railroad car, and the railroad had no part in it except ultimately transporting the waste away by railcar, and from *Pacific Fruit Express*, where the company's business was renting cars to railroads.  H&M's business is, again, to support Norfolk Southern's operations; that business does not merely incidentally use rail services to accomplish its objectives—supporting rail services *is* the objective. Norfolk Southern, in turn, relies on H&M to fulfill its obligations to its customers.

The facts here are, instead, more closely analogous to those in *Brooklyn Eastern District Terminal* and *Susquehanna*.  H&M was providing an integral part of the rail services Norfolk Southern sold to the public, and the record shows that H&M understood as much, and indeed publicly advertised its role and availability to perform those services.  David Weintraub, H&M's terminal manager at Croxton, testified that part of the company's job was to make sure the containers were made available for the customer:

Q: One of the other duties that we mentioned was that availability is met. . . .

A: Yes.

> Q: What does that mean?
>
> A: Making sure the containers and trailers are taken down and making sure availability is met for the customer.
>
> Q: What does that mean, availability is met?
>
> A: So that all the containers and trailers down. For example, on the 20E, everything is down by 12:00 p.m. So they dispatch for the different containers, trailers, they know it's available.

(D.E. 214-1, Hanna Decl. in Opp. to H&M Mot. Summ. J., Ex. 2, Weintraub Dep. 55:3-15.) Weintraub also testified to his understanding that the customer would then be notified that the container had been unloaded and was ready for the customer to pick it up. (*Id.* at 55:22-58:3.) Additionally, H&M publicly advertised its services to railroads such as Norfolk Southern on its website. (Hoist Supp. R. 56.1 Stmt. ¶ 20.) The same website also cites a different railroad, Union Pacific, as another client. (Hanna Decl., Ex. 3.) In *Susquehanna*, the Third Circuit looked to the company's publication of rates and its multiple customers as evidence of a holding out to the public of the availability of those services. 500 F.3d at 251. H&M's public-facing website permits the same conclusion here.

H&M argues that it is not a common carrier by railroad because it does not post tariffs, is not licensed by the STB, does not handle bills of lading, is not paid based on a percentage of a common carrier's profits, and there is no overlapping ownership or directors between it and Norfolk Southern. (H&M R. 56.1 Stmt. ¶¶ 10, 12-16.) Although when present these factors tend to support the conclusion that an entity is a common carrier, their absence does not require the opposite conclusion. *See Brooklyn Eastern District Terminal*, 249 U.S. at 304 ("The answer to [whether a company is a common carrier] does not depend upon whether its charter declares it to be a common carrier, nor upon whether the State of incorporation considers it such; but upon what it does."). Here, what H&M does is perform, by contract, a necessary part of the

intermodal rail transportation services Norfolk Southern, a common carrier by railroad, sells to the public, and H&M advertises itself as available to perform those functions. *Accord Luman v. ITS Techs. & Logistics, LLC*, 323 S.W.3d 821, 827 (Mo. Ct. App. 2010) (concluding that contractor performing essentially identical services as H&M to railroad was a "vital link in [the railroad's] intermodal system" and qualified as a common carrier under FELA); *see also Susquehanna*, 500 F.3d at 250 (inquiry's focus is substance of relationship between railroad and contractor, rather than on labels in their contract); *Greene v. Long Island R.R.*, 280 F.3d 224 (2d Cir. 2002) (affirming district court's denial of motion for summary judgment by parent company "directly and integrally involved in essential business aspects" of subsidiary railroad's operations).[9]

---

[9] To the extent plaintiff and Hoist rely on *Lone Star Steel Co. v. McGee*, 380 F.2d 640 (5th Cir. 1967), and *Kieronski v. Wyandotte T.R., Co.*, 806 F.2d 107 (6th Cir. 1986), the facts and analysis in those cases buttress the conclusion that H&M, on the record before this Court, is a common carrier subject to FELA, insofar as they determined common carrier status based on the substance of the company's operations and its relationship with an existing common carrier. But the Court declines to adopt the "considerations" or "categories" in those cases as a test for FELA liability; the Third Circuit has never done so, and in any event, the elements so identified merely aggregate factors other courts have taken into account in applying the fact-intensive inquiry long endorsed by the Supreme Court and Third Circuit. *See Watts*, 2014 U.S. Dist. LEXIS 84731, at *7 (citing *Lone Star* and *Kieronski* as creating "rubrics," but ultimately declining to dismiss a FELA claim at the pleadings stage because the statute's applicability "can only be determined by examining the facts surrounding [d]efendant's business activities").

Hoist and plaintiff also cite an order of an Arkansas state court, in *Hoots v. H&M Int'l Transp. Inc.*, 18CV-2016-499 (Jan. 19, 2019), denying H&M's motion for summary judgment in a FELA case arising from an accident in Marion, Arkansas, on the ground that it was a common carrier by railroad. (*See* D.E. 218-1, Liakas Decl., Ex. 3.) The order supplies no reasoning, and the Court declines to rely on it.

On the other side of the equation, H&M cites *Aguilar v. Norfolk Southern Corp.*, HUD-L-2507-18 (Feb. 4, 2020), a decision of the New Jersey Superior Court granting summary judgment to H&M on a FELA claim because it was not a common carrier by railroad. (*See* D.E. 238, *Aguilar* Decision.) Although the Court agrees with *Aguilar* insofar as it relies on *Kelly* and rejects *Lone Star* and *Kieronski* as the source of the relevant test, on the present motion record, the Court reaches a different conclusion; moreover, as the discussion above indicates, FELA has been

The test in this circuit for whether an entity is acting as a "common carrier by railroad" under FELA is open-ended and fact-sensitive, and has remained so for nearly 70 years.  It permits, and indeed compels, courts to recognize the substance of relationships, and not just their labels.  As the Supreme Court recognized in *Brooklyn Eastern District Terminal*, railroads may

---

interpreted by the Supreme Court and others to reach conduct similar to that of H&M here.  *See also Cont'l Indem. Co. v. H&M Int'l Transp., Inc.*, 2019 U.S. Dist. LEXIS 51557, at *8 (D.N.J. Mar. 26, 2019) (Walls, J.) ("'It is a recognized principle that a federal court is not bound by a state court's interpretation of federal laws[.]'" (quoting *United States v. Bedford*, 519 F.2d 650, 653 n.3 (3d Cir. 1975)).

H&M also cites two cases, *Tarboro v. Reading Co*., 396 F.2d 941 (3d Cir. 1968), and *Shaw v. Monessen S. R. Co.*, 200 F.2d 841 (3d Cir. 1953), in which the employment, not common carrier, element of the FELA claim, was in issue; in fact, the *Tarboro* panel expressly stated at the outset that the question of common carrier status was not before it because the plaintiff conceded the issue below.

Finally, the Court need not defer to the 2003 STB decision H&M cites (nor to the 2004 Railroad Retirement Board ruling, which itself merely deferred to the STB decision).  There, the STB concluded H&M was not a rail carrier operating in interstate commerce in its operations in Marion, Arkansas.  (*See* D.E. 208-5, Karlovich Cert. in Supp. of H&M Mot. Summ. J., Ex. 3, STB Decision.)  Not only did that decision concern H&M's operations nearly 20 years ago in a different state, the STB was only considering whether to institute a declaratory proceeding.  Its conclusions were based on the parties' pleadings and it saw "[n]o reason . . . to institute a proceeding to gather additional evidence."  *Id.* at 3; *see also* Karlovich Cert., Ex. 4, RRB Decision at 7 (concurring opinion) (observing that the "STB decision is based only on verified pleadings of the party").  The propriety of *Skidmore* deference to an agency decision depends on the decision's power to persuade, which turns on "'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 431 n.4 (2013) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  The limited record, paired with the STB's own acknowledgement that whether an activity constitutes "transportation by rail carrier" under the ICCTA is a "fact-specific determination" (STB Decision at 3), warrants the Court's independent evaluation of the record before it. To the extent H&M argues that the Court should defer under *Chevron* to the STB's interpretation of the ICCTA (which is, as noted earlier, a different statute from FELA), the Court is indeed applying the same approach the STB did – a fact-specific one based on the same considerations the STB cited.  (*See, e.g.*, STB Decision at 3 (considering, *inter alia*, whether H&M's operations would be considered "an integral part" of the railroad's common carrier service).)  The facts simply point to the opposite conclusion here.

delegate components of their essential operations to others, but they cannot necessarily subvert

the applicability of remedial legislation in so doing:

> The precise question presented is, therefore, whether the fact that the Terminal
> conducts these operations, not as an integral part of a single railroad system but
> wholly as an agent for one or several, exempts the railroad companies, because
> they are not the employer and exempts the Terminal, because it is not a common
> carrier; thus, making inapplicable a provision [the Hours of Service Act]
> regarding the physical operation of the property devised for the protection of
> employees and the public.

*Brooklyn Eastern District Terminal*, 249 U.S. at 305. *See also Luman*, 323 S.W.3d at 826

(railroad cannot avoid FELA liability by delegating its duties to an independent contractor, nor is

contractor performing "essential railroad operations" excused from responsibility).  On the

record before the Court, H&M is not entitled to judgment as a matter of law that it is not a

common carrier by railroad, and its motion for summary judgment will be denied.

### B.  Norfolk Southern Motion for Summary Judgment

Norfolk Southern moves for summary judgment on the FELA claim on the ground that it

cannot be liable under the statute because it did not employ Gomez. As set forth earlier, a viable

claim under FELA requires an employee-employer relationship between the plaintiff and the

defendant. *See McBride*, 564 U.S. at 691 ("Railroads are liable only to their employees, and only

for injuries sustained in the course of employment.").

It is undisputed that Gomez was employed by H&M.  However, for purposes of FELA, a

plaintiff can establish his or her "employment" with a rail carrier—*i.e.*, Norfolk Southern—

"even while . . . nominally employed by another" if (1) the employee is serving as a "borrowed

servant" of the railroad when injured, (2) the employee is deemed to be acting for two masters

simultaneously, *i.e.*, as a dual agent, or (3) the employee is a subservant of a company that, in

turn, was a servant of the railroad.  *Kelley v. Southern Pac. Co.*, 419 U.S. 318, 324 (1974).  The inquiry is whether an employer-employee, or master-servant, relationship exists.  *Id.* at 323.

The "'primary factor'" in evaluating the character of the relationship is whether the rail carrier "'had the power to direct, control and supervise the plaintiff in the performance of his work at the time he was injured.'"  *Williamson v. CONRAIL*, 926 F.2d 1344, 1350 (3d Cir. 1991) (quoting *Tarboro v. Reading Co.*, 396 F.2d 941 (3d Cir. 1968)).  Courts examine considerations such as "'who selected and engaged the plaintiff to do the work; who paid his wages for performing it; who had the power to terminate his employment; [and] who furnished the tools with which the work was performed and the place of work.'"  *Id.*  If the railroad plays a "'significant supervisory role'" as to the injured person's work, the requisite employment relationship exists.  *Id.* (quoting *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985)).  On the other hand, if the contact takes the form of the mere "passing of information" and "the accommodation that is obviously required in a large and necessarily coordinated operation," and is not imbued with a "supervisory character," an employment relationship does not exist under FELA.  *Kelley*, 419 U.S. at 330 (citing *Del Vecchio v. Pennsylvania R. Co.*, 233 F.2d 2, 5 (3d Cir. 1956)).

Seeking to fall in the latter category, Norfolk Southern argues that its involvement at the terminal reflected the type of "global oversight" that is "necessary and typical in order to run a large, complex intermodal operation," and that it did not exercise the requisite control over Gomez, either generally or with respect to the unloading of the container involved in the accident.  (D.E. 210-1, NS Moving Br. 2, 17-23.)  It characterizes its role in day-to-day operations as limited to supplying H&M management with the "consist," a list of inbound and outbound trains and information about them.  (*Id.* at 2, 20-22.)

20

In opposing the motion, both plaintiff and Hoist argue that there is, at minimum, a triable issue of fact as to whether Norfolk Southern exercised, or had the power to exercise, the requisite level of control over H&M or Gomez.  Plaintiff cites Norfolk Southern's requirement that H&M load and unload "hot boxes" (containers shipped by the railroad's premium customers) first, and, relatedly, that Norfolk Southern could change the order in which H&M operated in real time, that it instructed that the trains be loaded and unloaded in a certain period of time, and would occasionally ask H&M to deploy all sideloaders to unload a train. (Pl. Br. in Opp. to NS Mot. Summ. J. 8-9.)  Plaintiff also argues that Norfolk Southern could ban employees from the terminal.

Hoist points out Norfolk Southern owned the lift truck Gomez was using, argues that the railroad directed how the freight would be loaded and unloaded, and claims that under the operating agreement it could "constructively terminate" H&M employees by banning them from the terminal.  (D.E. 220, Hoist Br. in Opp. to NS Mot. Summ J. 10.)  It also claims that by paying H&M a per-lift rate for its services, Norfolk Southern was paying specifically for Gomez's services as the lift truck operator.

There is no evidence in the record from which it could be inferred that Gomez was Norfolk Southern's "borrowed servant" or a "dual servant" of both it and H&M.  It is undisputed that H&M hired its employees and conducted background checks and performed drug tests on them, and that Norfolk Southern was not involved in Gomez's hiring.  (D.E. 210-2, NS R. 56.1 Stmt. ¶¶ 11, 26.)[10]  H&M, not Norfolk Southern, paid Gomez, and H&M trained him.  (*Id.* ¶¶ 13-14, 19.)  Although Hoist contends that Norfolk Southern paid *H&M* for its services, this does not

---

[10] In view of plaintiff's failure to respond to Norfolk Southern's L. Civ. R. 56.1 statement, she is deemed to have admitted the factual statements in it for purposes of the motion, per L. Civ. R. 56.1(a).

mean Norfolk Southern paid *Gomez*.[11] The authority to discipline and terminate rested with

H&M.  (*Id.* ¶¶ 23-25.)[12]  With the exception of the lift truck (D.E. 221, Hoist Supp. R. 56.1 Stmt.

¶ 1), H&M provided all tools for the performance of Gomez's work.  And the only scenario in

which Norfolk Southern's terminal manager would communicate directly to an H&M operator

like Gomez is in the event the operations posed an immediate threat to the operator or others.

(*Id.* ¶ 47; *see also id.* ¶¶ 48-52.)  Otherwise, Norfolk Southern's communications were generally

directed only to H&M supervisors, not to line employees.  The only *Williamson* consideration

that favors nonmovants is Norfolk Southern's ownership of the terminal, and standing alone, that

is insufficient to find the existence of an employment relationship.

It is a closer question, however, whether Gomez qualified as a subservant of a company

that, in turn, was a servant of the railroad.  Taking the facts and inferences in the light most

favorable to the nonmovants, there is a genuine dispute of fact as to the extent of control Norfolk

Southern exercised over the performance of H&M, and, through H&M, the performance of

Gomez.   For example, H&M's Croxton terminal manager, David Weintraub, testified that

Norfolk Southern could change the order of loading or unloading, and would do so by

communicating to H&M supervisors:

---

[11] As Norfolk Southern points out, accepting this argument would effectively mean an
independent contractor's employee becomes the employee of the general contractor simply
because the latter pays the former, which is illogical and not in accordance with the case law.
(D.E. 235, NS Reply Br. 3-4.)

[12] Hoist attempts to create a factual dispute concerning H&M's sole authority to terminate its
employees by asserting that Norfolk Southern "could terminate Gomez's employment at
Croxton."  (D.E. 222, Hoist Resp. to R. 56.1 Stmt. ¶¶ 23, 27.)  The source it cites, section 1.5.5
of the operating agreement, merely allows the railroad to bar, not "terminate," an H&M
employee from Croxton terminal under specified conditions.  Moreover, H&M's terminal
manager testified that he could simply transfer an employee to another location if Norfolk
Southern raised an objection to an employee.  (NS R. 56.1 Stmt. ¶ 27.)

Q: So if the Norfolk Southern programmer wanted to change the order of
something, could they radio your supervisor and give them that directive, rake this
box down instead of that one?
A: Yes.
Q: And your hostler drivers and container handler drivers would also hear that
same directive on the radio?
A: Yes.
Q: Can your supervisors[13] communicate back to the Norfolk Southern personnel
in the Norfolk Southern building?
A: My supervisors and the programmers are the only ones that have
communication.
Q: But they have constant communication?
A: Yes.

(D.E. 221-1, Bruun Decl. in Opp. to NS Mot. Summ. J., Ex. 2, Weintraub Dep. 44:10-25.)

Norfolk Southern denies that it could do this (D.E. 236, NS Resp. to Pl. Supp. R. 56.1 Stmt. ¶

10), but the Court cannot resolve credibility disputes on summary judgment.  Additionally,

Norfolk Southern designates where the shipping containers are to be parked in the railyard.

(Weintraub Dep. 45:16-18.)  And although its provision of consists (train information) to H&M

is, on its own, unremarkable given the nature of the operations at the terminal, Norfolk Southern

also told H&M which cars contained "hot boxes," which it expected H&M to unload on a

priority basis given the railroad's agreements with certain shipping companies.  (*See* NS R. 56.1

Stmt. ¶¶ 30-39; D.E. 219, Pl.'s Br. 2-3 ¶¶ 4, 7, 9; NS Resp. to Pl. Supp. R. 56.1 Stmt. ¶ 9.)  It

further communicates to H&M management that H&M must load and unload trains within

specific time frames.  (NS Resp. to Pl. Supp. R. 56.1 Stmt. ¶ 11.)

Standing alone, Norfolk Southern's supplying of consists to H&M and its directions

about hot boxes and where to place railcars would appear insufficient to warrant finding an

employer relationship, given the Third Circuit's precedent in *Del Vecchio*, 233 F.2d 2.  But the

---

[13] Weintraub used the phrasing "my supervisors" throughout his deposition to refer to the
supervisors who reported to him. (Weintraub Dep. 35:23-36:8.)

dispute as to whether Norfolk Southern had real-time control over changes in the sequence of performance distinguishes this relationship from *Del Vecchio*; moreover, it is not just actual control, but the power or right to control that informs the decision of whether a master-servant relationship exists.  *See Williamson*, 926 F.2d at 1350.  On the one hand, the agreement imposes a host of safety requirements and requires compliance with the Norfolk Southern operating rules and manual; however, these appear to be commonplace requirements given the nature of the business being carried on.  *See Campbell v. BNSF Ry.*, 600 F.3d 667, 674 (6th Cir. 2010).  Also, as in *Del Vecchio*, the operating agreement does contain a provision, section 1.4, that disclaims any role for Norfolk Southern in the relationship between H&M and its employees:

> **1.4 Supervision and Performance of Work**.  Contractor is and shall remain an independent Contractor.  Contractor shall be solely responsible for, and Railway shall not participate in the employing or supervising of each person engaged in discharging Contractor's responsibilities under this Agreement; all such persons shall be the sole agents, servants and employees of Contractor.  The Contractor will pay all expenses and charges involved or incurred in any way in the performance of its obligations under this Agreement, including without limitation of personnel, fringe benefits, Social Security, Worker's Compensation unemployment insurance (as may be required by State or Federal law) and the cost of lubrication, supplies, depreciation, parts and maintenance for the equipment used in performing Contractor's obligations hereunder (except for any cost of maintenance expressly assumed by Railway under Subsection 1.2 and/or Appendix B with regard to any Intermodal Lift Machines.

(D.E. 210-3, Karpousis Decl., Ex. N1, Operating Agreement § 1.4.)  But this section does not exist in a vacuum, and other sections of the agreement reserve to Norfolk Southern authority to dictate various aspects of H&M's performance.  (*See id.* § 1.2 (permitting railroad to determine "in its sole but good faith judgment" what is reasonably necessary for the terminal's efficient operation, including specific support services that H&M must provide).  There is also language in the agreement that is directed to the manner in which H&M must perform the tasks assigned

to it.  (*See, e.g.*, *id.* § 1.1 (loading and unloading of units designated by railroad "shall include the proper application and removal . . . of hold-down or tie-down devices . . . .").  )

On this record, the Court cannot conclude that Norfolk Southern is entitled to judgment as a matter of law on plaintiff's FELA claim on the basis that it did not employ Gomez.  As such, summary judgment is not appropriate at this stage, and the motion will be denied.

### C.  Brady Marine Motion for Summary Judgment

Brady Marine has sought summary judgment in its favor on all claims against it, arguing that plaintiff has not, and cannot, prove the breach or causation elements of the common law negligence claim insofar as it is asserted against Brady.  (*See* D.E. 241-3, Brady Moving Br.) The company argues that its involvement in this case is based only on welding it performed on the lift truck Gomez later used, and that its work was done at the direction of the mechanic for the company charged with maintenance of the truck (TSI) and with the preapproval of the truck's manufacturer (Hoist).  (*Id.* at 4-5.)  Moreover, Brady continues, it did no welding in the area of the mast hinge assembly, which Brady characterizes as the only area of the truck relevant to the fatal incident and the only component of it that has been subject to destructive testing.  Because there is allegedly "no evidence" that its welding was deficient or that any deficiency in its work caused the accident, plaintiff "cannot establish with any evidentiary basis that Brady Marine's welds played any role whatsoever."  (*Id.* at 7.)  Brady further argues that the Court should disregard any expert opinion ultimately offered against it because the opinion would be "speculative and inadmissible."  (*Id.* at 8.)

Plaintiff, Hoist, and FedEx all oppose Brady's motion on the ground that it is premature in view of certain outstanding discovery.  When a party opposing a summary judgment motion believes more time is needed for discovery, Rule 56(d) specifies the necessary procedures.

*Commonwealth v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 139 (3d Cir. 1988)).  It provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). The affidavit should specify, "'for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Sebelius*, 674 F.3d at 157 (quoting *Dowling*, 855 F.2d at 139-40).

Properly filed requests under Rule 56(d) are usually granted "'as a matter of course,'" particularly "'when there are discovery requests outstanding or where relevant facts are under control of the party moving for summary judgment.'"  *In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749, 761 (3d Cir. 2019) (quoting *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015).  "If discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law."  *Shelton*, 775 F.3d at 568.

Hoist asserts that it is awaiting production of maintenance and repair records for the lift truck Gomez was operating, having requested them in investigating its theory that the mast of the lift truck was removed and negligently re-installed prior to the accident.  (*See* D.E. 243-1, Hoist Br. in Opp. to Brady Mot. Summ. J. 1, 9-10.)  Hoist frames this as an issue relevant to proximate cause, an essential element of plaintiff's negligence claim against Brady.  (*Id.* at 9-10.)  *See Fernandes v. DAR Dev. Corp., Inc.*, 222 N.J. 390, 403-04 (2015) (negligence claim requires proof of four elements: "(1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages").  It supports its Rule

56(d) request with an affidavit, as the rule requires, in which it details the basis for its theory and its efforts to obtain the records in issue.  (D.E. 243-2, Hoist R. 56(d) Affidavit.)  Hoist also argues that granting summary judgment in Brady's favor is inappropriate and premature because that expert reports have not been served or a deadline set for them in the face of ongoing fact discovery.  (Hoist Br. in Opp. to Brady Mot. Summ. J. 1, 11.)

FedEx argues that the deposition of a Hoist designee, which had been adjourned due to a now-resolved dispute over access to documents requiring proprietary software, remains outstanding, and anticipates that the deposition will address issues relating to the quality of Brady's welding and its relationship to the structural integrity of the lift truck. (D.E. 246, FedEx Br. in Opp. to Brady Mot. Summ. J. 4, 6-7.)  It also states that depositions of the welders who actually performed the work on the lift truck haven't yet been taken. (*Id.* at 7.)  In response to Brady's argument that only the mast hinge assembly had been subject to destructive testing, and that therefore no evidence relating to Brady's welds could be adduced, FedEx points out that the parties' consulting experts conducted numerous visual inspections of the entire lift truck—in other words, fact discovery has included the collection of evidence that ultimately could support an expert report.  (*Id.* at 8.)[14]

Finally, plaintiff argues that production of "welding procedure specifications" that identify the proper procedures for welding Hoist lift trucks remains outstanding. (D.E. 244, Pl.'s

---

[14] Neither FedEx nor plaintiff included a Rule 56(d) affidavit in their submissions. *See Sebelius*, 674 F.3d at 157 (affirming rejection of Rule 56(d) argument where nonmovant failed to submit affidavit).  However, in view of Hoist's procedurally compliant filing, and given that the substance of FedEx's and plaintiff's position is amply expressed in their respective papers, the Court will consider the additional outstanding discovery that they cite. *St. Surin v. V.I. Daily News*, 21 F.3d 1309, 1314 (3d Cir. 1994) (failure to include affidavit was not "automatically fatal" to argument under rule).

Br. in Opp. to Brady Mot. Summ. J. 1, 8.)  Additionally, she argues that the assigned welders have yet to be deposed and there are no expert reports prepared as yet.[15]

Given the outstanding discovery Hoist and FedEx and, to a lesser extent plaintiff, have identified and its relevance to multiple elements of the negligence claim against Brady Marine, summary judgment in its favor now would inappropriately curtail fact discovery and effectively deny the opportunity for expert discovery as to Brady Marine's alleged culpability altogether. This is not the rare case in which summary judgment would be appropriate before discovery is completed. *Shelton*, 775 F.3d at 568.  Brady Marine's motion will be denied without prejudice to renewal on an appropriate factual record.

## V.    <u>Conclusion</u>

H&M's motion (D.E. 208) and Norfolk Southern's motion (D.E. 210) are denied.  Brady Marine's motion (D.E. 241) is denied without prejudice.  An appropriate order will issue.

/s/ Katharine S. Hayden

Date: January 25, 2021                                   Katharine S. Hayden, U.S.D.J.

---

[15] To the extent plaintiff expresses vague concerns that she may not have been given all invoices or related records from Brady (*id.* at 7), this argument is insufficiently specific to warrant relief Fed. R. Civ. P. 56(d).